UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:18-cv-175-GCM
(3:12-cr-239-GCM-DCK-14)

| | |
|---|---|
| JAMES TYSON, JR., | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| vs. | )         **ORDER** |
| | ) |
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Respondent. | ) |
| ——————————————— | ) |

**THIS MATTER** is before the Court on Petitioner's Motion to Vacate, Set Aside or Correct Sentence under 28 U.S.C. § 2255, (Doc. No. 1).

## I.     BACKGROUND

From 2006 through 2012, Petitioner James Tyson, Jr. was one of four leaders of an enterprise that stole more than $75 million from investors, financial institutions, and lenders. (Crim. Case No. 3:12cr239-GCM-DCK-14, Doc. No. 945 at ¶¶ 7, 9, 11: PSR). Other leaders in the investment-fraud conspiracy included Carrie Tyson (Petitioner's mother), Victoria Hunt, and Vonetta Tyson Barnes (Petitioner's sister). (Id. at ¶ 39). Petitioner targeted professional athletes and doctors, as well as his personal and professional acquaintances. (Id.). If a victim did not have money to invest, Petitioner induced the victim to borrow from financial institutions and to sign the loan proceeds over to him and the racketeering enterprise for purported investment. (Id. at ¶ 40). Through these investment fraud operations, the enterprise induced more than 50 investor victims to invest over $27 million. (Id. at ¶ 41).

**A. Petitioner's investment-fraud scheme.**

Petitioner began his investment-fraud activities with a sham corporation named Brighton Developers. (Id. at ¶ 42). During the Brighton Developers phase of the investment-fraud scheme, Petitioner and others would present the potential investor-victim with a promissory note that would represent the amount of investment and the amount of return to be paid. (Id. at ¶ 43). To induce these investments, Petitioner and his co-conspirators made false and misleading statements, including, for example, that (a) investor funds would be invested in a real-estate project in Kannapolis, North Carolina, or in a real-estate project in Bristol, Tennessee; (b) the investments would be secured by lots in the Fisher Lake Farm subdivision in Kannapolis, North Carolina, or lots in the Bristol Trace subdivision in Bristol, Tennessee; and (c) the investment opportunity promised a return on the principal investment plus, depending on the investor, either 75% or 100% interest within 90 days. (Id. at ¶ 44).

While Petitioner represented that the monies were invested in real estate, in reality he and his co-conspirators used the money for their benefit, including (a) to fund the enterprise's mortgage fraud transactions; (b) to support lavish personal lifestyles that included expensive cars, luxury vacations, or throwing extravagant dinners and parties; (c) to invest in other sham businesses or other purported investments, without disclosing such purported change in investment to the victim; and (d) to pay back portions of the investments made by others, in Ponzi-scheme fashion. (Id. at ¶ 46). When investor-victims began demanding the return of their investment money, the Brighton Developers phase of the investment-fraud scheme began to collapse. (Id. at ¶ 64).

In an effort to maintain their enterprise and personal lifestyle, Petitioner and his co-conspirators created another sham corporation, Sovereign Equity. (Id.). With the creation of Sovereign Equity, Petitioner and his co-conspirators switched from "Promissory Notes" to

"Master Loan Agreements," which would represent the amount invested and promise certain returns to be paid out for a term of one year.  (Id. at ¶ 65).  Investor-victims were generally told that they would be investing in real estate, sports/entertainment, and/or business acquisitions.  (Id. at ¶ 66).  Again, however, Petitioner and his co-conspirators did not invest the money for the purposes represented to the victims and instead used the money to benefit themselves.  (Id. at ¶ 70).

When the Sovereign Equity phase of the investment-fraud scheme started to collapse, in order to continue the activities of the enterprise, Petitioner and his co-conspirators used the money they had fraudulently induced victim B.B. to invest in Sovereign Equity to create a third sham corporation, Prestige, so they could continue to solicit and steal money from investor victims.  (Id. at ¶¶ 101-06).  The pattern repeated itself again, with Prestige collapsing, and Petitioner and his co-conspirators creating yet another sham corporation, PEI, to defraud even more victims.  (Id. at ¶ 123).

As part of the investment-fraud scheme, Petitioner and his co-conspirators also purported to run car dealerships and used these car dealerships to induce victims of the investment-fraud scheme to take loans out of financial institutions and sign that money over to them.  (Id. at ¶¶ 129-31).  Petitioner and his co-conspirators misled investor-victims by representing that (a) the investor would receive a guaranteed monthly return on his or her investment; (b) the enterprise would make all loan payments for the investor; (c) the loans were personal loans, not car loans, but nonetheless would be secured by cars; (d) credit cards taken out in the investors' names would be used for business purchases, including to purchase vehicles; and (e) the enterprise would make the investors' credit card payments.  (Id. at ¶ 130).  Petitioner and his co-conspirators, however, used most of these loans to purchase cars, which they rarely provided to

the individuals who unwittingly had actually paid for them.  (Id. at ¶ 131).  And, instead of attempting to sell the cars, as promised, Petitioner and his-conspirators used the luxury cars for their personal benefit and as a show of wealth in an effort to induce victims to invest in their various sham corporations.  (Id.).

**B. Petitioner's mortgage-fraud scheme.**

Between 2005 and 2007, Petitioner also led a mortgage-fraud scheme.  (Id. at ¶ 144). The mortgage-fraud scheme was generally conducted in the following manner: (a) Petitioner or a co-conspirator agreed with a builder or owner to purchase a property at a set price (the "true price"); (b) they recruited a buyer to purchase the property at an inflated price, which was usually between $200,000 and $800,000 above the true price; (c) the buyer agreed to purchase the property in his or her own name and sign whatever documents were necessary in exchange for a hidden kickback; (d) the builder sold the property at the inflated price; (e) the lender issued a mortgage loan on the basis of the inflated price; and (f) the difference between the inflated price and the true price was extracted at closing and distributed among Petitioner and his co-conspirators.  (Id. at ¶ 145).  Petitioner served as a promoter, recruiting straw buyers, arranging fraudulent transactions, providing down-payment money through straw companies, and receiving millions of dollars in fraudulent proceeds, often through sham companies used to disguise that he was receiving the kickbacks.  (Id. at ¶¶ 10-18).

To induce lenders to make mortgage loans, Petitioner and his co-conspirators caused loan packages to be prepared and submitted to lenders that contained false and misleading statements, including a misrepresentation of the true sales price and an inflation of the straw buyer's assets. (Id. at ¶ 146).  Petitioner and his co-conspirators also caused the HUD-1 Settlement Statements associated with fraudulent transactions to contain numerous false and misleading statements,

enabling entities controlled by members of the racketeering enterprise to receive disbursements and the buyer to receive a portion of the mortgage-loan proceeds.  (<u>Id.</u> at ¶ 147).

For example, Petitioner provided the down-payment money for co-conspirator and straw purchaser George Moore's fraudulent purchase of 6510 Pembry Links Circle in Charlotte, North Carolina, through two transfers from his Brighton Developers account.  (<u>Id.</u> at ¶¶ 161-63). Petitioner then received a hidden kickback of approximately $125,000, following the closing, through his Brighton Developers account.  (<u>Id.</u> at ¶ 164).

Petitioner also provided down-payment money for co-conspirator Mary Vaughn's fraudulent purchase of 1040 Spyglass in Marvin, North Carolina.  (<u>Id.</u> at ¶ 176).  Rather than Vaughn occupying the property as had been represented to the lender, Petitioner and his family moved into the Spyglass property and used it as a show of wealth to further their investment-fraud operations.  (<u>Id.</u> at ¶ 177).

As a final example, Petitioner provided down-payment money for straw purchaser N.M.'s fraudulent purchase of 9215 Woodhall Lake Drive in Waxhaw, North Carolina, again using checks from Brighton Developers, which were funded by the proceeds of Petitioner's investment fraud activities.  (<u>Id.</u> at ¶¶ 196-98).  Following the closing on 9215 Woodhall Lake Drive, Petitioner received a hidden kickback of more than $400,000, again through his Brighton Developers account.  (<u>Id.</u> at ¶ 199).  This fraudulent kickback was falsely listed on the HUD-1 Settlement Statement as if it were payment to Brighton Developers for work done on the property, when in reality it was simply a kickback to Petitioner for his role in the transaction. (<u>Id.</u> at ¶ 198).

**C. Petitioner participates in the distribution of marijuana.**

In addition to investment- and mortgage-fraud activities, between 2005 and 2010, Petitioner and his co-conspirators transported truckloads of marijuana from Texas to North Carolina and elsewhere. (Id. at ¶ 242). Petitioner leased a truck to bring in shipments, and he boasted that he was running a marijuana operation. (Id. at ¶ 243). Petitioner directed co-conspirator Melvin Moye to deliver between 50 and 100 pounds of marijuana on four or five separate occasions. (Id. at ¶ 244).

**D. Petitioner conspires to bribe bank employees.**

In August and September 2007, Petitioner and his co-conspirators bribed bank employees to cash checks received from fraudulent mortgage transactions, to deposit these checks in a manner designed to conceal the true distribution of the proceeds, and to supply false letters of credit. (Id. at ¶¶ 246-48). For example, one bank employee was paid $10,000 for her help with the production of bogus letters of credit that Petitioner and his co-conspirators could use to obtain funds. (Id. at ¶¶ 257-58).

Petitioner's various schemes caused huge losses. The losses related to Petitioner's securities fraud involved 62 victims and losses of $18,847,460.63. (Id. at ¶ 142, Attach. A). Over a million dollars in losses came from loan proceeds that Petitioner and others had fraudulently induced victims to take out of lending institutions and to "invest" in the companies operated by the Enterprise. (Id. at ¶ 143). These losses were documented through bank records and other documentation. (Id. at ¶ 142). Petitioner was involved in 18 different mortgage fraud transactions, which resulted in a total loss of $11,232,623.43. (Id. at ¶ 239, Attach. B). Financial institutions lost over $5 million, while Petitioner's gross proceeds exceeded $1 million. (Id. at ¶ 240).

A grand jury indicted Petitioner, charging him with racketeering conspiracy, in violation of 18 U.S.C. § 1962(d) (Count One); securities fraud, in violation of 15 U.S.C. § 78j(b), 78ff; 17 C.F.R. § 240.10b-5; 18 U.S.C. § 2 (Count Two); aiding and abetting mortgage fraud, in violation of 18 U.S.C. §§ 2, 1344 (Count Three); aiding and abetting wire fraud, in violation of 18 U.S.C. §§ 2, 1343 (Count Four); money laundering conspiracy, in violation of 18 U.S.C. § 1956(h) (Count Five); and bank bribery conspiracy in violation of 18 U.S.C. §§ 2, 371 (Count Six). (Id., Doc. No. 158: Indictment).

**E. Following the collapse of the various schemes and the cooperation of other co-conspirators, Petitioner agrees to plead guilty to all charges.**

After the vast majority of Petitioner's co-conspirators pleaded guilty, Petitioner agreed to enter a straight-up guilty plea to the charges. (Id., Doc. No. 823 at 5-7). At the plea hearing, he testified that he understood that he had the right to have a district judge conduct the plea proceeding, but that he consented to proceed with his plea before a magistrate judge. (Id., Doc. No. 497 at 2-3: Plea Tr.). Petitioner stated that he had received a copy of the indictment, had discussed it with his attorney, and fully understood the charges, which the Government summarized. (Id. at 3-8). He also stated that he had discussed the Sentencing Guidelines with his attorney and understood that the guideline range could not be determined until later and that he could be sentenced above or below the guidelines, but could not withdraw his guilty plea if the sentence was more severe than he expected. (Id. at 8-9). Petitioner affirmed that he understood that he was giving up his right to a trial, that he was guilty of the offenses, and that no one had threatened, intimidated, or forced him to plead guilty, nor had anyone made any promises of leniency. (Id. at 10-11). Petitioner also stated that he understood that the Court could order restitution. (Id. at 9). Petitioner affirmed that he had sufficient time to discuss the

case and any potential defenses with his attorney and that he was satisfied with his attorney, who had "been great." (Id. at 11). The magistrate judge determined that Petitioner's guilty plea was knowingly and voluntarily made and accepted it. (Id. at 12).

The probation officer prepared a PSR, which grouped the offenses and applied the highest offense level, which was for the RICO offense. (Id., Doc. No. 808 at ¶ 270: PSR). The probation officer then looked to the money laundering conspiracy charge and the underlying offenses for that, which included securities, bank, and wire fraud. (Id.). Pursuant to U.S.S.G. § 2B1.1(a) & (b), Petitioner's base offense level was seven; he received a 22-level enhancement because the amount of loss exceeded $20 million, but was less than $50 million; a four-level enhancement because the offense involved more than 50 victims; a two-level enhancement because the offense involved the use of sophisticated means; and a two-level enhancement for deriving more than $1 million in gross receipts from one or more financial institutions, which resulted in a base offense level of 37. (Id.). The probation officer also applied a two-level enhancement because the offense involving a violation of § 1956; a two-level vulnerable-victim enhancement; a two-level obstruction-of justice enhancement; and a four-level enhancement for being an organizer or leader of criminal activity involving five or more participants. (Id. at ¶¶ 271-74). Allowing a three-level reduction for acceptance of responsibility, Petitioner's total offense level was 43. (Id. at ¶¶ 277-79 (higher offense levels are treated as level 43)). Petitioner's criminal history category was I, which, as limited by the statutory maximums, made his advisory guideline range 1380 months. (Id. at ¶¶ 275, 290, 309-10).

Petitioner objected to the PSR, arguing that the vulnerable-victim enhancement should not apply; Petitioner was unaware of the terms of the agreement between Hunt, Steven Jones, and victim B.B. and this loss should not be attributed to him; the losses from the properties at

5020 Oxfordshire Road and 1625 Lookout Circle should not have been included in the loss amount; a leadership enhancement should not apply to a money laundering charge; and the enhancement for obstruction of justice did not apply.  (Id., Doc. Nos. 872, 1001).  He also objected to the portion of the PSR detailing Petitioner's transportation of marijuana.  (Id., Doc. No. 872 at 2).  Based on these objections, Petitioner asserted that his adjusted offense level should be 37.  (Id. at 4).  In supplemental objections, Petitioner argued that F.M.'s losses were not the direct and proximate result of Petitioner's conduct and that, although this amount did not impact the guidelines calculation, it might impact his argument for a downward variance.  (Id., Doc. No. 1024).  He also filed a sentencing memorandum seeking a downward variance to 15 years of imprisonment.  (Id., Doc. No. 1001).

At sentencing, Petitioner reaffirmed that the answers he gave during his plea hearing were true and correct and that he was pleading guilty because he had committed the crimes with which he was charged.  (Id., Doc. No. 1096 at 27: Sent. Tr.).  Petitioner admitted that he had reviewed the PSR with his attorney.  (Id. at 28).  This Court sustained Petitioner's argument that the vulnerable victim enhancement should not apply based on the conspirators targeting professional athletes.  (Id. at 16-19).  Defense counsel stated that the only outstanding objection that affected the guideline range was the enhancement for obstruction of justice.  (Id. at 28).  The Government declined to present evidence on this issue, and the Court did not apply this enhancement, finding that the offense level was 40, Petitioner's criminal history category was I, and the guideline range was 292 to 365 months of imprisonment.  (Id. at 29, 34).  Defense counsel argued that the $7.5 million loss attributed to F.M. should not be included in the loss amount, or as restitution, because this conduct was separate from the conspiracy.  (Id. at 30).  She asserted that this transaction involved Petitioner and two other individuals, and that it

involved 90% of any profits going to F.M., and 10% of any profits going to the Loring Group and Petitioner.  (Id.).  She contended that there was no criminal intent involved in this transaction because Petitioner would only make money if F.M. did.  (Id.). Moreover, she argued that Petitioner was cut out of the deal when F.M. decided to invest in a different company, Rare Earth Holdings, Inc.  (Id. at 31).

The Government noted that this objection would not impact the guideline range, that it was untimely, and that F.M.'s loss was tied to the conspiracy.  (Id. at 32).  According to the Government, Petitioner flew F.M. to Charlotte on a private jet using money stolen from the Enterprise's victims in an effort to induce F.M. to invest in the Enterprise, and F.M. lost $7.5 million based on representations that Petitioner made.  (Id. at 32-33).  The Court overruled the objection to the amount of loss, agreeing that this sum would not impact the guideline range, but kept the issue of restitution open.  (Id. at 34).

Defense counsel sought a downward variance, arguing that due to the grouping and enhancement guidelines, a more appropriate offense level would be 35.  (Id. at 35-36).  She also asserted that Petitioner's sentence should be lower to avoid unwarranted sentencing disparities.  (Id. at 37-40).  Counsel contended that it was "extremely significant" that Petitioner took responsibility for each and every offense without requesting a trial, that he had been a model inmate, that he was very remorseful, and that the way that he had handled the case demonstrated that he could be rehabilitated.  (Id. at 39-40).  Petitioner allocuted and stated that he "truly believed" in the companies, but that "internal mismanagement and bad decisions" had caused problems.  (Id. at 41).  He asked the Court for a lenient sentence so that he could try to be a successful businessman and compensate the victims.  (Id. at 42).

The Government argued that Petitioner was the most culpable of all of the 91 defendants charged as part of Operation Wax House. (Id. at 46). The Government asserted that Petitioner had the opportunity to cooperate before he was charged, but he instead chose to start new fraudulent companies, and that his decision to plead guilty was not based on his desire to accept responsibility and to show remorse, but was based on the fact that almost 40 co-conspirators were prepared to testify against him, and hundreds of thousands of documents directly implicated him. (Id. at 55-56). The Government contended that Petitioner's offense conduct was distinct, given the variety of criminal activity he engaged in, the period of time over which he conducted these activities, and the brazen nature of his having created fraudulent company after fraudulent company. (Id. at 57).

This Court found that Petitioner was "the apex of this pyramid of criminal behavior." (Id. at 58). The Court imposed a 360-month sentence (240 months as to Counts One, Two, Four, and Five; 360 months on Count Three; and 60 months on Count Six), citing the extremely serious nature of the offenses, the need to provide deterrence, to promote respect for the law, and to protect the public from further fraud. (Id. at 58-59). The Court also ordered Petitioner to pay $18,847,460.63 in restitution, less the $7.5 million as to F.M., which it reserved ruling on. (Id. at 60 (citing Doc. No. 995)). Post-sentencing, the Government submitted a supplemental filing in support of requiring Petitioner to pay $7.5 million restitution to F.M. (Id., Doc. No. 1090). This Court agreed and ordered Petitioner to pay this amount in restitution, following repayment to the other victims. (Id., Doc. No. 1143).

Petitioner appealed, arguing that his sentence was unconstitutional under the Ex Post Facto Clause because this Court applied the Fraud Enforcement and Recovery Act ("FERA") retroactively and used the 2014 sentencing guidelines. United States v. Tyson, 672 F. App'x

292, 293 (4th Cir. 2016).  Petitioner challenged the amount of restitution and his conviction for

money laundering conspiracy, and he argued that he had received ineffective assistance of

counsel.  Id. at 293-94.  He also challenged the sentencing enhancements for the number of

victims, use of sophisticated means, deriving more than $1 million in gross receipts from

financial institutions, having a § 1956 conviction, and Petitioner's role in the offense.  Amend.

Appellant's Opening Br., United States v. Tyson, No. 15-4323 (4th Cir. Mar. 10, 2016), ECF No.

90.  The Fourth Circuit affirmed, holding that there was no ex post facto violation and that the

sentencing enhancements were properly applied.  Tyson, 672 F. App'x at 293.  The Fourth

Circuit also found that there was no reversible error with respect to the restitution award and that

Petitioner had waived any merger challenge to his money laundering conviction by pleading

guilty, but declined to review the claims of ineffective assistance on direct appeal.  Id. at 293-94.

The Fourth Circuit entered its decision on January 5, 2017.  (Crim. Case No. 3:12cr239-GCM-

DCK-14, Doc. No. 1263).

 Petitioner timely filed the present motion to vacate on April 2, 2018.  The Government

filed its response on June 11, 2018, and Petitioner filed a Reply on July 18, 2018.  (Doc. Nos. 3,

4).  Thus, this matter is ripe for disposition.

## II. STANDARD OF REVIEW

 Rule 4(b) of the Rules Governing Section 2255 Proceedings provides that courts are to

promptly examine motions to vacate, along with "any attached exhibits and the record of prior

proceedings . . ." in order to determine whether the petitioner is entitled to any relief on the

claims set forth therein.  After examining the record in this matter, the Court finds that the

arguments presented by Petitioner can be resolved without an evidentiary hearing based on the

record and governing case law.  See Raines v. United States, 423 F.2d 526, 529 (4th Cir. 1970).

### III.    DISCUSSION

Under the Sixth Amendment, criminal defendants have the right to effective assistance of counsel.  U.S. CONST. amend. VI.  To prevail on a § 2255 claim of ineffective assistance of counsel, a petitioner has the burden of establishing both (1) that defense counsel's performance was deficient, in that counsel's "representation fell below an objective standard of reasonableness" as measured by "prevailing professional norms," and (2) that this deficient performance prejudiced the petitioner.  Strickland v. Washington, 466 U.S. 668, 687-88, 694 (1984).  Courts must apply a "highly deferential" standard in reviewing an attorney's performance and "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  Id. at 689.  To establish prejudice, the petitioner must demonstrate there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Id. at 694.  "A reasonable probability is a probability sufficient to undermine confidence in the outcome."  Id.  It is not sufficient to show the mere "'possibility of prejudice.'"  Satcher v. Pruett, 126 F.3d 561, 572 (4th Cir. 1997) (quoting Murray v. Carrier, 477 U.S. 478, 494 (1986)).  In considering the prejudice prong, a court "can only grant relief under . . . Strickland if the 'result of the proceeding was fundamentally unfair or unreliable.'"  Sexton v. French, 163 F.3d 874, 882 (4th Cir. 1998) (quoting Lockhart v. Fretwell, 506 U.S. 364, 369 (1993)).  If a petitioner fails to conclusively demonstrate prejudice, the reviewing court need not consider whether counsel's performance was deficient.  United States v. Terry, 366 F.3d 312, 315 (4th Cir. 2004).

To establish prejudice in the context of a guilty plea, a petitioner must show that "'there is a reasonable probability that, but for counsel's errors, [the defendant] would not have pleaded guilty and would have insisted on going to trial.'"  Meyer v. Branker, 506 U.S. 358, 369 (4th Cir.

13

2007) (quoting <u>Hill v. Lockhart</u>, 474 U.S. 52, 59 (1985)).  The petitioner's "subjective

preferences" are not dispositive, but rather the test is "whether proceeding to trial would have

been objectively reasonable in light of all of the facts," <u>United States v. Fugit</u>, 703 F.3d 248, 260

(4th Cir. 2012), and whether the petitioner has shown that there is "contemporaneous evidence"

supporting his expressed preferences, <u>Lee v. United States</u>, 137 S. Ct. 1958, 1967 (2017).

In evaluating claims under § 2255, statements made by a defendant under oath at a plea

hearing carry a "strong presumption of verity" and present a "formidable barrier" to subsequent

collateral attacks.  <u>Blackledge v. Allison</u>, 431 U.S. 63, 73-74 (1977).  As the Fourth Circuit has

made clear, "courts must be able to rely on the defendant's statements made under oath during a

properly conducted Rule 11 plea colloquy," and § 2255 claims that contradict a petitioner's plea

colloquy are deemed "patently frivolous or false," except in extraordinary circumstances.  <u>United

States v. Lemaster</u>, 403 F.3d 216, 221-22 (4th Cir. 2005).

Petitioner argues that his attorney failed to: (1) investigate the case, file discovery

motions, or research potential defenses; (2) challenge the FERA charges as barred by the statute

of limitations and the Ex Post Fact Clause; (3) advise him that he would be subject to a drug

offense; (4) properly advise him as to what a RICO enterprise was; (5) advise him that he had the

right to plead guilty before an Article III judge; or (6) challenge his money laundering

conspiracy conviction.  (Civ. Doc. No. 1-2 at 7-12, 14, 19-20: Pet'r's Br.).  He contends that

counsel advised him to plead guilty straight up without attempting to explain his conduct at the

plea hearing and that he could explain his conduct at sentencing, where she would call "an

expert" to prove that he was not accountable for the full scope of the conspiracy.  (<u>Id.</u> at 2, 17,

19, 24).  He asserts that if counsel had provided sound advice, he would have proceeded to trial.

(<u>Id.</u> at 15, 18).  He also contends that if counsel had investigated, she should have been able to

show that his role in the conspiracy and offenses "was by far not what the Government alleged." (Id. at 8).

A defendant generally waives all non-jurisdictional defects in the proceedings conducted before the entry of his plea, including claims of ineffective assistance of counsel, that do not affect the voluntariness of the plea. United States v. Moussaoui, 591 F.3d 263, 279 (4th Cir. 2010); see Fields v. Att'y Gen. of Md., 956 F.2d 1290, 1294-96 (4th Cir. 1992); accord United States v. Torres, 129 F.3d 710, 715 (2d Cir. 1997); Wilson v. United States, 962 F.2d 996, 997 (11th Cir. 1992); Smith v. Estelle, 711 F.2d 677, 682 (5th Cir. 1983). Although Petitioner arguably waived all of his pre-plea claims of ineffective assistance, because he asserts that counsel's ineffective assistance affected the voluntariness of his guilty plea, the Court will address the substance of his claims.

**A. Petitioner's claim that counsel was ineffective for failing to investigate the facts of his case.**

To support an ineffective assistance claim based on the failure to investigate, a petitioner must present specific information to show what favorable evidence the investigation would have produced. See Beaver v. Thompson, 93 F.3d 1186, 1195 (4th Cir. 1996). If there is "no reasonable probability that a possible defense would have succeeded at trial," counsel's failure to investigate the defense is not prejudicial. See Savino v. Murray, 82 F.3d 593, 599 (4th Cir. 1996).

Petitioner contends that counsel failed to file pre-trial motions that "could have required the Government to reveal helpful and critical information." (Doc. No. 1-2 at 7). He asserts generally that this could have shown that his role in the offense was not what the Government alleged. (Id. at 8). He argues that counsel's actions violated the ABA's Model Code of

Professional Responsibility. (Id. at 7). He argues that counsel's advice to plead guilty straight up was deficient because counsel had not investigated potential defenses to the charges and that he was prejudiced by pleading guilty without a plea agreement. (Id. at 8, 12).

Petitioner does not specify what evidence counsel did not obtain that might have shown a defense to the charges. Therefore, this claim is dismissed as conclusory. See United States v. Dyess, 730 F.3d 354, 359-60 (4th Cir. 2013) (holding it was proper to dismiss § 2255 claims based on vague and conclusory allegations). Furthermore, his allegation that counsel violated the rules of professional responsibility is not cognizable under § 2255 because it does not state a constitutional claim. Cf. Nix v. Whiteside, 475 U.S. 157, 165 (1986) (holding that "a court must be careful not to narrow the wide range of conduct acceptable under the Sixth Amendment so restrictively as to constitutionalize particular standards of professional conduct"); United States v. Henry, 447 U.S. 264, 275 n.14 (1980) (noting Code of Professional Responsibility did "not bear on the constitutional question" in the case). Additionally, even if he could bring these claims, Petitioner has not shown prejudice because he cannot point to any evidence that would have shown that it would have been objectively reasonable to proceed to trial, or that there was any contemporaneous evidence that he wished to do so. See Meyer, 506 F.3d at 369.

**B. Petitioner's claim that counsel was ineffective for failing to bring an ex post facto challenge and a FERA challenge**.

Petitioner next contends that counsel should have argued that the mortgage fraud charges under § 1344 violated the Ex Post Facto Clause and were untimely because the Government applied the 2009 FERA statute, 123 Stat. 1617, to conduct that occurred before its enactment. (Doc. No. 1-2 at 9-11). He asserts that counsel should have moved to dismiss any transactions

that occurred before July 26, 2007, when the five-year statute of limitations that he asserts applies would have run.  (Id. at 11).

Petitioner cannot show deficient performance or prejudice because the Fourth Circuit rejected his ex post facto and statute of limitations arguments on appeal.  See Tyson, 672 F. App'x at 293 (holding "[o]ur review of the record reveals no ex post facto violation" and that the sentencing enhancements were properly applied despite a challenge to the statute of limitations); cf. United States v. Linder, 552 F.3d 391, 397 (4th Cir. 2009) (holding petitioner could not re raise the same issue presented on direct appeal in a § 2255 motion); Boeckenhaupt v. United States, 537 F.2d 1182, 1183 (4th Cir. 1976) (claims considered on direct review may not be recast "under the guise of collateral attack").

This Court also has rejected a challenge to the timeliness of the charges in this case.  In United States v. Perry, No. 3:12cr239, 2013 WL 6795021, at *4 (W.D.N.C. Dec. 20, 2013), one of Petitioner's co-defendants challenged the timeliness of Counts One and Five.  This Court rejected this challenge, holding that the statute of limitations for Count One was ten years because one of the predicate acts was a violation of § 1344 and that, with respect to Count Five, the superseding indictment related back to the original indictment.  Id.; see Brown v. Elliott, 225 U.S. 392, 401 (1912) (continuing offense doctrine); United States v. 400 Roper St., Morganton, N.C., No. 1:10cv18, 2010 WL 2574040, at *3 (W.D.N.C. May 11, 2010) (holding it is sufficient if the conspiracy continued into the limitations period).  Finally, even if Petitioner could raise this claim, it is without merit.  FERA did not change the 30-year maximum penalty for bank fraud, see 18 U.S.C. § 1344,[1] nor did it change the applicable ten-year statute of limitations, see

---

[1]  Petitioner cites 18 U.S.C. § 1343, but that section also authorizes a 30-year penalty for wire fraud affecting a financial institution.  He also cites 18 U.S.C. § 3282, which provides a five-year statute of limitation for noncapital offenses where no other limitations period is provided by law.

18 U.S.C. § 3293. Accordingly, Petitioner cannot show ineffective assistance based on the failure to raise meritless claims.

**C. Petitioner's claim that counsel was ineffective for failing to advise him of a drug charge.**

Petitioner next contends that he advised counsel that he was not involved in distributing marijuana and did not know why this allegation was included in the Indictment. (Doc. No. 1-2 at 19). He contends that counsel advised him that because the Indictment did not contain specific allegations regarding the drug distribution, she did not believe that the Government would pursue this charge at the plea hearing. (Id.). Petitioner contends both that counsel advised him that she did not believe that the Government would pursue a drug charge at the plea hearing, id. at 19, and that counsel failed to advise him that he would be subject to a drug offense, id. at 20.

Petitioner was not charged with a drug offense. Rather, one of the RICO predicate offenses was marijuana distribution. To establish a RICO conspiracy, "the government must prove that an enterprise affecting interstate commerce existed; 'that each defendant knowingly and intentionally agreed with another person to conduct or participate in the affairs of the enterprise; and . . . that each defendant knowingly and willfully agreed that he or some other member of the conspiracy would commit at least two racketeering acts.'" United States v. Mouzone, 687 F.3d 207, 218 (4th Cir. 2012) (quoting United States v. Wilson, 605 F.3d 985, 1018-19 (D.C. Cir. 2010)). Here, one of the predicate racketeering acts alleged involved the transportation of marijuana. (Crim. Case No. 3:12cr239-GCM-DCK-14, Doc. No. 158 at 76). Unlike the other predicate acts, this was not charged as a separate offense. Thus, contrary to Petitioner's assertion, he was not charged with and did not plead guilty to a drug-trafficking offense. Rather, he pleaded guilty to racketeering. Even assuming that counsel advised

Petitioner that the Government would not pursue a drug charge, there is no deficient performance because this was not a separate charge, and Petitioner cannot show prejudice because he also admitted to more than two other predicate acts, and the drug predicate did not increase his guideline range.  See (Crim. Case No. 3:12cr239-GCM-DCK-14, Doc. No. 994 at ¶¶ 270-75).

**D.  Petitioner's claim that counsel was ineffective for failing to advise him of the RICO charge.**

Petitioner next contends that counsel did not advise him that "a RICO enterprise is a group of person[s] associated together for a common purpose of engaging i[n] a course of illegal conduct."  (Doc. No. 1-2 at 19).  According to Petitioner, he told his counsel that "he was not associated in 'fact' with a large number of the" individuals named in the Indictment.  (Id.).  He points to ten people who he asserts were involved in ventures that he had nothing to do with or knew nothing about.  (Id.).

"It is of course elementary that one may be a member of a conspiracy without knowing its full scope, or all its members, and without taking part in the full range of its activities or over the whole period of its existence."  United States v. Banks, 10 F.3d 1044, 1054 (4th Cir. 1993). Thus, a conspirator need not know all of the members of the conspiracy to be liable for conspiracy.  United States v. Burgos, 94 F.3d 849, 858 (4th Cir. 1996).  "The government need not establish that each conspirator had knowledge of all of the details of the conspiracy but, rather, only that the defendant participated in the conspiracy with knowledge of the essential nature of the plan."  United States v. Tillett, 763 F.2d 628, 632 (4th Cir. 1985).

The Superseding Indictment defined the Enterprise as "a group of individuals and entities associated in fact," and stated that its "members and associates functioned as a continuing unit for a common purpose of achieving the objectives of the Enterprise."  (Crim. Case No.

3:12cr239-GCM-DCK-14, Doc. No. 158 at 5).  The Indictment set out the purposes of the

Enterprise, id. at 5-6, the individuals and entities associated with the Enterprise, id. at 6-20, as

well as the means and methods of the Enterprise, id. at 20-21.  Although Petitioner asserts that he

did not understand the nature of the RICO charge, this assertion contradicts his sworn testimony

during the plea hearing, during which Petitioner affirmed that he had received a copy of the

Indictment, had discussed it with his attorney, and fully understood the charges.  (Crim. Case No.

3:12cr239-GCM-DCK-14, Doc. No. 497 at 3, 8).

Moreover, Petitioner was liable as a RICO conspirator even if he was not aware of all

aspects of the Enterprise.  See Mouzone, 687 F.3d at 218 (holding that a defendant need not

agree to commit two or more racketeering acts himself to be guilty of racketeering conspiracy,

"simply agreeing to advance a RICO undertaking is sufficient").  Accordingly, Petitioner cannot

show prejudice because he was informed of and stated that he understood the RICO charge

before pleading guilty to it, see Blackledge, 431 U.S. 73-74; his assertion that he was not

involved with or did not know about ventures by certain other members in the Enterprise is

conclusory, see Dyess, 730 F.3d at 359-60; and he did not have to be aware of all aspects of the

Enterprise to be liable for conspiracy, see Mouzone, 687 F.3d at 218.

**E.  Petitioner's claim that counsel was ineffective for failing to advise him that he had the right to plead guilty before a district court judge.**

Petitioner next contends that if his counsel had advised him that he had the right to plead

guilty before a district court judge, he would have exercised that right.  (Doc. No. 1-2 at 14).

Although acknowledging that the magistrate judge inquired whether Petitioner understood his

right to proceed before an Article III judge, he contends that if he had proceeded before a district

court judge, an adequate factual basis would have been established, rather than simply a

reiteration of the charges in the Superseding Indictment.  (Id.).  Petitioner contends that he would

not have pleaded guilty to a drug offense if a sufficient factual basis had been presented at the

plea hearing.  (Id. at 20).

Even if counsel failed to advise Petitioner of his right to proceed before an Article III

judge, the fact that Petitioner did not elect to do so after the magistrate judge advised him of that

right establishes that he cannot show prejudice.  See (Crim. Case No. 3:12cr239-GCM-DCK-14,

Doc. No. 497 at 2-3; United States v. Clare, 660 F. App'x 643, 646-47 (10th Cir. 2016) (rejecting

ineffective assistance claim based on failure to advise defendant of right to plead guilty before an

Article III judge).  Petitioner's contention that a different factual basis would have been

established if the plea had proceeded before an Article III judge is speculative.  Moreover, his

argument is misplaced both because an adequate factual basis was established, see Crim. Case

No. 3:12cr239-GCM-DCK-14, Doc. No. 497 at 3-8 (referencing paragraphs 1-307 of the

Indictment), and, even if it had not been, the factual basis need not be established at the plea

hearing.  See United States v. Dixon, 105 F. App'x 450, 451 (4th Cir. 2004).  Pursuant to Federal

Rule of Criminal Procedure 11(b)(3), the district court must determine that there is a factual basis

for entering a guilty plea "before entering judgment."  Here, this Court determined that there was

a sufficient factual basis at sentencing.  (Crim. Case No. 3:12cr239-GCM-DCK-14, Doc. No.

1096 at 28).

Petitioner's assertion that counsel's advice to plead guilty straight up can be attributed to

the failure to establish a sufficient factual basis during the plea hearing is frivolous, as any such

advice from counsel would have preceded the plea hearing.  And his assertion that counsel's

advice not to attempt to explain his involvement in the offenses during the plea hearing was

deficient, is also baseless, as the plea hearing and Rule 11 involve allowing a defendant to admit

to the elements of the offense.  Should a defendant attempt to explain or limit his involvement in the offense, this would risk a court rejecting the plea.  Therefore, any such advice by counsel was not deficient, and Petitioner cannot show prejudice where by pleading guilty he received a three-level reduction for acceptance of responsibility, which reduced the advisory guideline range from life imprisonment to 292-365 months.

**F.  Petitioner's claim that counsel was ineffective for failing to challenge the money-laundering conspiracy offense to which Petitioner pleaded guilty.**

Petitioner next contends that counsel should have challenged his offense of conspiracy to commit money laundering because the Superseding Indictment is not supported with specific facts, does not identify who conspired to launder money, and charges conspiracy to avoid a merger issue under United States v. Santos, 553 U.S. 507 (2008).  (Doc. No. 1-2 at 36-38).

An indictment is generally sufficient if it follows the words in the statute and provides a defendant with sufficient notice of the charge.  United States v. Smith, 44 F.3d 1259, 1263-64 (4th Cir. 1995).  The elements of money laundering conspiracy are: "(1) an agreement to commit money laundering existed between one or more persons; (2) the defendant knew that the money laundering proceeds had been derived from an illegal activity; and (3) the defendant knowingly and voluntarily became part of the conspiracy."  United States v. Singh, 518 F.3d 236, 248 (4th Cir. 2008).  The indictment need not allege details of the unlawful activity underlying the money laundering charge.  United States v. Cherry, 330 F.3d 658, 667-68 (4th Cir. 2003); United States v. Bolton, 325 F.3d 471, 490-93 (4th Cir. 2003); Smith, 44 F.3d at 1265 (because "the core of money laundering . . . is the laundering transaction itself," the details regarding the nature of the unlawful activity underlying the proceeds do not need to be alleged).  Here, the Superseding Indictment adequately alleged the elements of money laundering conspiracy and specifically

identified other co-conspirators involved.  See (Crim. Case No. 3:12cr239-GCM-DCK-14, Doc. No. 158 at 84).  In any event, the Superseding Indictment incorporated by reference paragraphs 1-392, which spelled out the factual circumstances of the transactions.  See (Id., Doc. No. 158 at ¶¶ 194, 199); see United States v. Ali, 735 F.3d 176, 193-94 (4th Cir. 2013) (finding incorporation of prior paragraphs of indictment sufficiently detailed the factual circumstances of the money laundering offense).

Petitioner's contention that counsel should have argued that the count should have been charged as straight money laundering, rather than money-laundering conspiracy, is also without merit.  He has shown no proper basis on which counsel could have made this argument, particularly in light of the Government's discretion to determine what charges to present to a grand jury.  See United States v. Torrez, 869 F.3d 291, 312 (4th Cir. 2017), pet. for cert. filed, No. 17-1189.

### G.  Petitioner's claims of ineffective assistance of counsel at sentencing.

Petitioner raises numerous challenges to counsel's performance at sentencing, arguing that counsel did not properly object to the amount of restitution or to the calculation of the amount of loss and did not object to the guidelines-based sentencing enhancements.

### (i) Petitioner's challenge as to restitution.

Petitioner first contends that his attorney failed to challenge the amount of restitution. (Doc. No. 1-2 at 21).  This claim is not cognizable on collateral review.  Section 2255 provides that:

> A prisoner in custody under sentence of a court . . . claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or law of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

28 U.S.C. § 2255(a). "A reduction in restitution is not a release from custody." <u>Blaik v. United States</u>, 161 F.3d 1341, 1342 (11th Cir. 1998) (collecting cases). "[I]t is well settled that § 2255 relief may not be granted when the defendant challenges only a fine or restitution order." <u>United States v. Coward</u>, 230 F.3d 1354, at *1 (4th Cir. 2000) (unpublished table decision). Because restitution is a financial penalty, not a physical constraint on liberty, Petitioner may not challenge the order of restitution in a § 2255 proceeding. <u>See</u> <u>United States v. Hudgins</u>, 201 F. App'x 142, 143 (4th Cir. 2006); <u>but cf.</u> <u>United States v. Luessenhop</u>, 143 F. App'x 528, 531 (4th Cir. 2005) (allowing, without discussion of propriety of proceeding under § 2255, an ineffective assistance of counsel claim where defendant made showing that the amount of loss and amount of restitution would have been substantially lower).

The fact that Petitioner is alleging ineffective assistance with respect to restitution does not change this result, because he is still seeking to challenge a non-custodial restitution order. <u>See</u> <u>Kaminski v. United States</u>, 339 F.3d 84, 85 n.1 (2d Cir. 2003) (recognizing that, even if defendant could show ineffective assistance with respect to restitution, the district court lacked subject matter jurisdiction to grant relief under § 2255); <u>Carpenter v. United States</u>, No. 3:15cv161, 2015 WL 5254185, at *4 (W.D.N.C. Sept. 9, 2015) (unpublished) (holding "Petitioner's assertions that his counsel provided ineffective assistance with respect to the order of restitution are not cognizable under § 2255"). Therefore, Petitioner's assertion that counsel provided ineffective assistance with respect to the restitution order will be dismissed because it is not cognizable under § 2255. In any event, Petitioner's assertion that counsel provided ineffective assistance regarding the order of restitution lacks merit. Restitution is mandatory under 18 U.S.C. § 3663A and U.S.S.G. § 5E1.1, and the Fourth Circuit affirmed the amount of

restitution on direct appeal. <u>Tyson</u>, 672 F. App'x at 293. Accordingly, even if Petitioner could show deficient performance, he cannot show prejudice. Therefore, this claim will be denied.

**(ii) Petitioner's contention that counsel failed to challenge the amount of loss.**

Petitioner next contends that his attorney failed to challenge the amount of loss. In determining the amount of loss, a district court need only make a reasonable estimate of the amount based on the available information in the record. <u>United States v. Stone</u>, 866 F.3d 219, 228 (4th Cir. 2017). The greater of the actual loss or the intended loss applies. U.S.S.G. § 2B1.1 cmt. n.3(A) (2014). Although the amount of loss should be reduced by the amount of money or the fair market value of property returned, this amount should be credited only if the money or property was returned "before the offense was detected." <u>Id.</u> cmt. n.3(E). A defense is detected when it is discovered by a victim or a government agency, or when a defendant knows or reasonably should have known that the offense was or was about to be detected, whichever is earlier. <u>Id.</u> cmt. 3(E)(i). "Actual loss" is "the reasonably foreseeable pecuniary harm that resulted from the offense," or the pecuniary harm that the defendant knew or should have known "was a potential result of the offense." <u>Id.</u> cmt. 3(A)(i), (iv). "Intended loss" is "the pecuniary harm that was intended to result from the offense" and includes harm that would have been unlikely or impossible to occur. <u>Id.</u> cmt. (3)(A)(ii). The amount of loss includes losses stemming from a defendant's relevant conduct. U.S.S.G. § 1B1.3(a); <u>United States v. Newsome</u>, 322 F.3d 328, 339 (4th Cir. 2003). Where a defendant participates in jointly undertaken criminal activity, his relevant conduct includes "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." U.S.S.G. § 1B1.3(a)(1)(B).

Petitioner contends that his counsel provided ineffective assistance at sentencing because she did not timely object to the $7.5 million loss to F.M. and this was the single largest

transaction used to determine his guideline score. (Doc. No. 1-2 at 21-24). He argues that his only involvement in the transaction was a potential payment of 10% of any profits, that he never received any money from the transaction, and that the agreement that F.M. entered with Rare Earth Holdings, Inc. was not alleged in either the original or the Superseding Indictment. (Id. at 23). He argues that if counsel had brought these facts to the Court's attention, the Court would have excluded the F.M. transaction from the calculation of the sentencing range and that this would have reduced his sentence. (Id. at 23-24).

Counsel did, in fact, object to including the F.M. transaction in the loss calculation, arguing that it was conduct separate from the conspiracy, that Petitioner lacked criminal intent to defraud because the only way that Petitioner would have made money was if F.M. made money, and that F.M. chose to invest with a different company. (Crim. Case No. 3:12cr239-GCM-DCK-14, Doc. No. 1096 at 30-31). This Court overruled the objection, noting that it did not affect the guideline computation. (Id. at 34). The Court did not state that it would not consider the objection because it was untimely. (See id.). Petitioner does not dispute that he was involved in this transaction, noting that he was to receive 10% of any profits. (Doc. No. 1-2 at 23). He also does not counter the Government's argument at sentencing that Petitioner flew F.M. to Charlotte on a private jet with funds from the Enterprise in an effort to induce F.M. to invest in the Enterprise and that F.M. parted with his money based on Petitioner's representations. See (Crim. Case No. 3:12cr239-GCM-DCK-14, Doc. No. 1096 at 32-33).

An indictment need not identify every act committed in furtherance of a conspiracy, nor does it need to set forth relevant conduct. See United States v. Palacios, 677 F.3d 234, 244-45 (4th Cir. 2012); cf. Witte v. United States, 515 U.S. 389, 405-06 (1995) (holding consideration of relevant conduct at sentencing does not constitute punishment for that conduct). Accordingly,

the Court rejects Petitioner's assertion that the F.M. transaction would not have been included in the loss calculation if counsel had objected to it on the basis that it was not included in the Indictment. Additionally, because the amount of loss is based on the higher of actual or intended loss, whether Petitioner profited from the transaction does not affect the amount for which he is accountable. See U.S.S.G. § 2B1.1 cmt. n.3(A).

Thus, Petitioner has not shown deficient performance where counsel objected to F.M.'s loss amount, but this objection was overruled. Nor has Petitioner shown prejudice because the amount of loss was properly included and, as this Court determined, this loss did not affect the guideline range. See (Crim. Case No. 3:12cr239-GCM-DCK-14, Doc. No. 1096 at 34).

Petitioner also contends that counsel should have objected to the loss amounts from Brighton Developers, Sovereign Investments, Sovereign Equity Group, and the Prestige Fund. (Doc. No. 1-2 at 25-33). He contends that he only used a Brighton Developers account for mortgage transactions, but did not solicit any investor funds through this account. (Id. at 26). He concedes that he borrowed money from this account, but he contends that this was done with Hunt's permission and that he returned this money to the appropriate investors. (Id. at 26-27). Petitioner asserts that he bought an $18,864 watercraft after returning funds to the Brighton Developers account. (Id. at 27-28). He argues that only Hunt and Bernard Butts were authorized signatories on the Sovereign Investments account and that investor B.B. sued Hunt, but not Petitioner, over his $3.7 million loss. (Id. at 29-30). Petitioner contends that he had no decision-making authority or involvement in the Prestige Fund's illegal activities. (Id. at 31-32).

Petitioner and his mother "owned and controlled" Brighton Developers, and Petitioner admitted that he was a managing partner with Brighton Development from 2006 to 2007. (Crim. Case No. 3:12cr239-GCM-DCK-14, Doc. No. 994 at ¶¶ 42, 305). Petitioner helped create the

sham corporation, Sovereign Equity, in which B.B. was told that his money was being invested, and Petitioner assisted in dividing B.B.'s money and using it for unauthorized purposes, including creating another sham corporation—Prestige Capital. (Id. at ¶¶ 105-06). Thus, Petitioner was also a founder of Prestige Capital. (Id. at ¶ 106). Petitioner helped create these entities to further the purposes of the Enterprise. Accordingly, Petitioner's contention that he should not be held liable for fraudulent transactions involving these entities is without merit. See U.S.S.G. § 1B1.3(a)(1)(B). The Court further finds that counsel was not ineffective for failing to challenge these losses. Petitioner attempts to disclaim responsibility for the $3.7 million transaction involving Hunt. (Doc. No. 1-2 at 30). He argues that Hunt made misrepresentations to B.B. and was sued in Florida state court over this transaction. (Id. at 29-30). Despite these contentions, the evidence shows that B.B.'s money was wired into a Sovereign Equity account, where Petitioner and others divided this money and used it for various unauthorized purposes, such as making Ponzi payments to other investors and paying for other aspects of the Enterprise. (Crim. Case No. 3:12cr239-GCM-DCK-14, Doc. No. 994 at ¶¶ 102, 105). Accordingly, Petitioner's contention that counsel should have objected to inclusion of this loss amount is without merit.

Because the amount of loss is not reduced by funds returned after an offense is detected, Petitioner's claim that counsel should have argued that the loss amounts should have been reduced by payouts from the Montana Securities Commission or based on other funds that were returned to investors as part of other litigation is also without merit. See U.S.S.G. § 2B1.1 cmt. n.3(E); United States v. Payne, 127 F. App'x 638, 640-41 (4th Cir. 2005) (holding amount of loss should not be reduced where defendant turned house over as part of her effort to make restitution after her offense had been discovered); United States v. Merritt, 102 F. App'x 303,

311 (4th Cir. 2004) (recognizing "[t]he fact that a victim has recovered part of its loss after discovery of a fraud does not diminish the defendant's culpability for purposes of sentencing"). As the Government noted in its sentencing memorandum, investigation into the Enterprise began in 2007. (Crim. Case No. 3:12cr239-GCM-DCK-14, Doc. No. 823 at 1). Petitioner has not shown that any funds or property were voluntarily returned to victims before detection of the fraud.

Petitioner also complains that counsel should have objected because neither the Superseding Indictment nor the PSR listed the specific victims affected by his offense. (Doc. No. 1-2 at 28-29). The indictment was not required to list all victims of the offense, see, i.e., United States v. Hayes, 322 F.3d 792, 801-02 (4th Cir. 2003) (relevant conduct need not be charged in the indictment), and the victims of the investment and mortgage fraud and their individual losses are detailed in Attachments A and B to the PSR. The investment-fraud losses were reported by the victims and verified through bank records and other documentation. (Crim. Case No. 3:12cr239-GCM-DCK-14, Doc. No. 994 at ¶ 142). The mortgage-fraud losses were calculated using sales contracts, loan documents, and resale documents. See (Id., Doc. No. 994: PSR Attach. B). Therefore, Petitioner's assertion that counsel should have objected to any lack of factual recitation regarding the losses in the Indictment or the PSR shows neither deficient performance nor prejudice, particularly where he has not shown what additional facts could have been included in the PSR that would have reduced the amount of loss for which he was responsible.

In addition to complaining of the amount of loss related to the investment-fraud scheme, Petitioner also contends that counsel should have objected to the mortgage-fraud loss amount. (Doc. No. 1-2 at 29, 35-36). He argues that the mortgage-fraud loss amount included the inflated

price of all loans, without an adjustment for the amounts recovered in foreclosure sales, and that it should only have included amounts from financial institutions. (<u>Id.</u> at 29, 35-36). This argument is baseless, as the amount of loss was reduced by the amounts recovered when the properties were resold following foreclosure. <u>See</u> (Crim. Case No. 3:12cr239-GCM-DCK-14, Doc. No. 994, PSR Attach. B). <u>See also</u> <u>United States v. Robinson</u>, 88 F. App'x 660, 662 (4th Cir. 2004) (subtracting foreclosure amount from gross loan amount)).

Additionally, any mortgage fraud losses sustained by entities other than a financial institution constituted relevant conduct. Accordingly, counsel was not deficient and Petitioner cannot show prejudice from any failure to raise these objections to the loss amounts.

**(iii) Counsel's failure to lodge various objections to the sentencing enhancements.**

Petitioner next contends that counsel should have objected to the sophisticated means, gross receipts, role in the offense, and number-of-victims enhancements and should have argued that the two-level enhancement under U.S.S.G. § 2S1.1(b)(2)(B) constituted double-counting. (Doc. No. 1-2 at 38-40). Counsel raised these objections on appeal, and they were rejected. Petitioner cannot relitigate these issues here, and, even if he could, he cannot show deficient performance or prejudice because, as the Fourth Circuit held, these challenges were without merit. <u>See</u> <u>Tyson</u>, 672 F. App'x at 293.

In sum, Petitioner's Enterprise involved a web of corporate entities and fraudulent transactions, sham corporations, the bribery of bank employees to obtain falsified documents, an elaborate system of falsification and kickbacks involving appraisers, real estate agents, builders, and lawyers, and he was at the pinnacle of the Enterprise. <u>See, i.e.,</u> (Crim. Case No. 3:12cr239-GCM-DCK-14, Doc. No. 994 at ¶¶ 8-11, 144-48). Accordingly, there was no basis for objecting to the sophisticated means and role in the offense enhancements. <u>See</u> U.S.S.G. § 2T1.1 cmt. n.5

("Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts ordinarily indicates sophisticated means."); United States v. Jinwright, 683 F.3d 471, 486-87 (4th Cir. 2012) (holding the sophisticated means enhancement applies when the means of execution or concealment involves more than ordinary or generic case); U.S.S.G. § 3B1.1(a) (a four-level increase applies if the defendant was an organizer or leader of a criminal activity involving five or more participants); cf. United States v. Flood, No. 3:12cv186, 539 F. App'x 248, at *5 (W.D.N.C. 2013) (applying leadership enhancement to Ericka Flood, who ran one of the mortgage fraud cells in Petitioner's scheme). The documented losses from the mortgage-fraud scheme included over $1 million, which supported the gross receipts enhancement. See (Crim. Case No. 3:12cr239-GCM-DCK-14, Doc. No. 994: PSR Attachs. B & C). The documented losses from the investment scheme identifies 62 victims, which is more than sufficient to justify the number-of-victims enhancement. See U.S.S.G. § 2B1.1(b)(2)(A) & cmt. n.1 (providing a four-level enhancement applies if the offense involved 50 or more victims and victims include individuals and corporations); Crim. Case No. 3:12cr239-GCM-DCK-14, Doc. No. 994 at ¶ 142, Attachs. A & B. The two-level enhancement in U.S.S.G. § 2S1.1(b)(2)(B) for convictions under § 1956 is not impermissible double-counting because the base offense level does not take into account the various types of money laundering. See United States v. Demarest, 570 F.3d 1232, 1243 (11th Cir. 2009); Arrollo-Silva v. United States, No. 5:16cv730, 2017 WL 2117321, at *2 (E.D.N.C.) (report and recommendation), adopting R&R, 2017 WL 2082885 (E.D.N.C.), appeal dismissed, 703 F. App'x 206 (4th Cir.

2017).  Accordingly, Petitioner cannot show deficient performance or prejudice based on counsel's failure to raise meritless objections.[2]

(H) **Petitioner's claim of ineffective assistance of appellate counsel.**

Petitioner next contends that his appellate counsel should have raised the substantive claims underlying his ineffective assistance claims under the plain error standard, rather than pursuing them as ineffective assistance claims that were not cognizable on direct appeal.  (Doc. No. 1-2 at 41-42).  This claim will be dismissed as conclusory because Petitioner does not specifically identify the claims or explain how he could have met the plain error standard had they been raised on direct appeal.  See Dyess, 730 F.3d at 359-60.

## IV.    CONCLUSION

For the foregoing reasons, the Court denies and dismisses Petitioner's Section 2255 petition.

**IT IS, THEREFORE, ORDERED** that:

1.    Petitioner's Motion to Vacate, Set Aside or Correct Sentence under 28 U.S.C. § 2255, (Doc. No. 1), is **DENIED** and **DISMISSED**.

2.    **IT IS FURTHER ORDERED** that pursuant to Rule 11(a) of the Rules Governing Section 2254 and Section 2255 Cases, this Court declines to issue a certificate of appealability.  See 28 U.S.C. § 2253(c)(2); Miller-El v. Cockrell,

---

[2]  Petitioner also contends that the November 2015 amendments to the Sentencing Guidelines should apply to his offense because his appeal was still pending when these amendments took effect.  (Doc. No. 1-2 at 40).  He does not assert that counsel was ineffective for failing to raise these not-yet-effective amendments, but he argues that this Court should apply them to his sentence.  (Id. at 41).  Petitioner does not allege cause and prejudice to overcome the procedural bar to his failure to raise this argument previously.  See Bousley v. United States, 523 U.S. 614, 621-22 (1998).  In any event, Amendments 791 and 792, which relate to U.S.S.G. § 2B1.1(b), are not retroactive.

537 U.S. 322, 338 (2003) (in order to satisfy § 2253(c), a petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong); <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000) (when relief is denied on procedural grounds, a petitioner must establish both that the dispositive procedural ruling is debatable and that the petition states a debatable claim of the denial of a constitutional right).

Signed: October 31, 2018

Graham C. Mullen
United States District Judge